PUBLIC SERVICE RAILWAY COMPANY

*v.*

BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF HUDSON.

[Decided March 19th, 1917.]

1. In a suit by a street railway to restrain a county from constructing any new bridge which would not be of sufficient strength to accommodate complainant's traffic, the burden is on the county claiming contribution to show the excess amount required to be expended to accommodate complainant's traffic.

2. If estimates had been procured showing the cost of the two kinds of bridges, the difference between them would, in the absence of fraud or bad faith, be the amount to be so contributed, and the burden of proof would have been to a certain extent shifted.

3. The street railway is responsible only for the excess amount fairly expended by the county, caused by its use of the bridge, and not for unnecessary concrete overties or a greater amount of metal made necessary by their use, or for expensive construction due to expected increase in general traffic.

4. In this suit the acceptance of the statement of the county's expert that a bridge to accommodate ordinary traffic could be built for $3,000 or $4,000 less than the bridge that was built to accommodate street railway traffic, as proof of the proper amount of contribution, was error.

On bill, &c.

Mr. Frank Bergen, for the complainant.

Mr. James J. Murphy, for the defendants.

LANE, V. C.

The bill was filed on May 26th, 1908, to secure an injunction restraining defendant from interfering with the use of a bridge over the Morris canal on Avenue C, a public highway between the cities of Jersey City and Bayonne and to restrain it from constructing any new bridge which would not be of sufficient strength to accommodate the trolley service maintained by the complainant. The original contention of complainant was that the bridge was part of the highway and that the freeholders were under a duty of maintaining that portion of the highway, as every other portion, in such manner as to accommodate all lawful traffic and that under certain statutes complainant's trolley service was within the term lawful traffic, for which defendant must provide. The case was originally referred to Vice-Chancellor Emery who, on November 10th, 1910, determined that, by force of statutes referred to, there was imposed upon the complainant a duty, so far as this particular bridge was concerned, of contributing to the cost of the new bridge which had been constructed. The measure of the contribution was in the language of the vice-chancellor the "increased expense due to the necessity of providing for the increase in weight and capacity of the cars." The matter was referred to a master to determine the amount of contribution. No decree of any nature was made. Due to the illness of the special master the cause after testimony had been taken was referred to another master. The matter comes before me on a motion to confirm this master's report, he having found that the amount of contribution was the sum of $3,000 with interest from June 3d, 1909. Con-

520 CASES IN CHANCERY, 1917.

Pub. Serv. Ry. Co. v. Freeholders of Hudson. 87 N. J. Eq.

firmation is resisted by complainant. The motion should have been for a final decree. No formal exceptions were filed to the master's report. If it were necessary that they should be to raise the issue I should treat them as having been filed. I shall treat this motion as for a final decree in the cause, based upon all the testimony taken. While in the state of this record I am not bound by the opinion of Vice-Chancellor Emery, yet, by acquiescence, it has become the law of the case, and I shall consider merely the amount that the complainant should contribute toward the expense of the construction of this bridge under the rules determined by him. I have considered the opinion, the testimony, the report of the master, and the instructive briefs of counsel, and I have come to the conclusion that the master applied an erroneous theory in dealing with the facts. The question before him was how much money did the county fairly expend in addition to what it would have otherwise expended, for the purpose of accommodating the trolley traffic. The master seems to consider that complainant was obliged to pay such an amount as the county expended upon the bridge over and above the amount for which a bridge might have been constructed at the time to accommodate ordinary traffic. Obviously, this is an entirely different proposition. Plans and specifications for the bridge were procured and adopted and the bridge was constructed without consultation with complainant. It is demonstrated that the engineer for the county was inefficient. Complainant is not responsible for acts or mistakes of the defendant or of its engineer, nor for extravagance, if there was such. The burden is on the county to show the amount that it has expended for the purpose of accommodating this traffic. It is fairly on the county. It had sole control of the construction of the bridge. If it had been desired the amount might have been fixed with approximate certainty. The county, in 1908, when the bridge was commenced, might have had prepared plans and specifications for such a bridge as would have been built if it was not essential to provide for trolley traffic, and such a bridge as in fact was built, and to have estimates and bids thereon. If this course had been pursued the amount of contribution would be the difference between the two, in the absence of proof

of fraud or bad faith. The burden, to a certain extent at least, would have been shifted. It appears that the engineer selected plans of the American Bridge Company for a bridge of railroad construction—that is, construction designed for accommodation of steam locomotives. The American Bridge Company have plans for bridges of highway construction, designed one class to accommodate trolley traffic, and another not. Railroad construction is much more expensive than highway construction. It appears without dispute that highway construction could have been used in this instance and a bridge so constructed would have accommodated the trolley traffic. I do not intimate that the use by the county of railroad construction was extravagant or unjustified, but I do find that, under the testimony, and by that I am bound, such railroad construction was not rendered necessary by reason of the trolley traffic. If railroad construction is a proper construction for this avenue, and the witnesses have testified it is, it is because the general traffic and its expected increase make it advisable and in the end economical. Complainant is not responsible for the increase of expense due to expected increase of general traffic. All that complainant is responsible for is the amount fairly expended by the county caused by its use of the bridge. Four experts of reputation testified that the increased weight of metal necessarily placed in the bridge to accommodate it for trolley traffic is eight thousand six hundred and forty pounds, and the increase in cost $302.40, arrived at by multiplying eight thousand six hundred and forty pounds by three and a half cents a pound. The bridge was constructed by the American Bridge Company for so much a pound of metal—the prevailing practice. This increase of metal was necessary to strengthen the four girders upon which rested the four trolley tracks. The trolley tracks rest directly upon the girders so that the weight is taken by them. The evidence is clear that the vibration caused by the trolley cars as the result of impact is not distributed, at least to any appreciable degree, to any other portion of the bridge, and that the trolley cars might run over the four girders, if they were properly stayed, if the remainder of the bridge were non-existent. The only evidence produced by the defendant which can be depended upon

522            CASES IN CHANCERY, 1917.

Pub. Serv. Ry. Co. *v.* Freeholders of Hudson.     87 *N. J. Eq.*

is that of an expert who testified, generally, that the cost of the bridge was increased some $3,000 by reason of the fact that it had to be adapted for trolley service. He produced a plan of a bridge which could have been constructed for some $4,000 less than the present bridge, which bridge he testified would accommodate all of the general traffic aside from the trolley cars. This bridge is designed according to highway construction specifications. It has, I think, five girders instead of twelve and is of a considerably lighter construction. To meet this complainant's expert testified that taking the plan of defendant's expert the bridge could be made to accommodate trolley traffic at an increased expense of $418.95. To this testimony there was no reply. If a bridge could have been constructed according to the plans and specifications designed for highway construction, which could be made to accommodate trolley traffic for a slightly increased expense, it was the duty of the county, as to the complainant, assuming no other circumstances present, to construct such a bridge. Complainant is not responsible for the fact that it did not. There is no evidence whatever that trolley traffic alone requires the railroad construction used. As indicating what causes the difference between the two methods of construction, it is only necessary to say that in figuring the weight, stress and strain, a bridge must bear, so far as ordinary highway travel is concerned, there is figured an impact of twenty-five per cent. upon the live load, whereas in railroad construction, by reason of the impact of heavy locomotives with their unbalanced wheels, there is figured an impact of eighty-one per cent. of live load. This latter percentage does not apply to trolley cars, the wheels of which are of the same weight in all parts and which travel at a comparatively low rate of speed. The testimony of all the experts is to the effect that the impact caused by a locomotive running under a speed of fifteen miles an hour is hardly perceptible. If that be true, how much less is the impact of a trolley car which very seldom travels over the rate of fifteen miles an hour, with its balanced wheels. The engineer erred when he figured on a bridge to bear a weight increased by an impact of eighty-one per cent. of live load; that he did so figure is clearly shown by the plans and specifications which

call for a bridge to bear a live load of sixteen tons with an impact of eighty-one per cent. The engineer again erred when he figured sixteen tons as live load; he should have figured, according to the weight of the testimony, twenty-four tons live load with impact twenty-five per cent. The result was that he really got a bridge which may be eminently fit and proper for the locality, but by reason of its form of construction, at a cost much greater than if some other plan had been adopted. It is said that by reason of the use of the bridge by the trolley cars some six inches of concrete over the entire bridge was necessary, more than otherwise would be, this, because of the ties upon which the rails rest increasing the depth of the floor some six inches. The cost of this figured up amounts to the sum of $202. I do not think complainant is responsible. The testimony without contradiction is to the effect that complainant did not want ties; they were put in without consultation with it. The experts agree that it is better construction to lay the rails directly upon the girders, for one reason that there is nothing to rot, whereas, if wooden ties are used, in case of deterioration, the entire concrete base and cover must be taken out. The fact is that a great deal more concrete was rendered necessary because no reinforcement was used. This not only increased the amount of concrete but also the dead load of the bridge and made necessary a greater amount of metal. For this complainant is not responsible. The experts agree, and the court will almost take judicial knowledge of the fact that good practice require that reinforcement should be used in a case like this. An attempt was made by the county through the testimony of its engineer to show that the bridge was constructed wider because of its use by complainant. The testimony demonstrated that the engineer did not know his own bridge. The proof is clear that the bridge is precisely the same width as was the old bridge.

I think I have said enough to indicate my reasons for concluding that the master erred. He seems to have taken the statement of the expert of the county that a bridge *could* be built to accommodate ordinary traffic for three or four thousand dollars less than the bridge that *was* built as proof of the amount that

the complainant should contribute, and in this I think he erred. There was no attempt to prove the kind of bridge or the cost of it that the county would have built if there was no trolley service to be provided for. All of the evidence is before me and there will be no re-reference.

I will advise a final decree upon the testimony before me. I cannot find that the county has proven by evidence worthy of serious consideration that the county was fairly obliged to expend more than the sum of $302.40 for this bridge, by reason of the fact that it was obliged to accommodate complainant's trolley cars.

Settle the decree on notice.